UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

Clarity Diagnostics, LLC,   Case No. 24-18938-EPK
                            (Jointly Administered)

      Debtor.   Chapter 11
_____/

In re:

Clarity Lab Solutions, LLC,   Case No. 24-19243-EPK

      Debtor.   Chapter 11
_____/

# CLARITY LAB SOLUTIONS, LLC'S APPLICATION TO EMPLOY CROWN MEDICAL COLLECTIONS, LLC AS SPECIAL COUNSEL COLLECTIONS COUNSEL EFFECTIVE AS OF THE PETITION DATE

Clarity Lab Solutions, LLC (the "Debtor"), by and through its undersigned counsel and pursuant to 11 U.S.C. § 327(e), 11 U.S.C. § 330(a), Federal Rule of Bankruptcy Procedure 2014, and Federal Rule of Bankruptcy Procedure 2016, hereby requests that the Court authorize the Debtor to employ Crown Medical Collections, LLC ("Crown"), as the Debtor's special collections counsel, effective as of the Petition Date. In support, the Debtor states as follows:

    1.    On September 10, 2024, the Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code. The Debtor is a Florida limited liability company that is operating its business and managing its affairs as a debtor in possession pursuant to 11 U.S.C. § 1180.

    2.    The Debtor provides laboratory testing services primarily for the detection of urinary tract infections, wound pathogens, ear, nose, and throat pathogens, and respiratory pathogens including Covid-19. The Debtor focuses on polymerase chain reaction (PCR) testing.

    3.    The Debtor still has outstanding revenue from its Covid-19 testing.

{2519/000/00589913}

4. On November 17, 2023, pre-petition, the Debtor retained Crown, a healthcare accounts receivable collection firm, that focuses heavily on the collection of COVID-19 related AR in accordance with federal law, including:

(a) Sections 6001-6005 of the Families First Coronavirus Response Act, which requires group health plans, health insurers offering group or individual health insurance coverage, Medicare, Medicare Advantage, and Medicaid Plans to provide benefits for certain items and services related to the detection of SARS-CoV-2 or the diagnosis of Covid-19, when those items or services are furnished on or after March 18, 2020. During the applicable emergency period, plans and issuers were mandated to provide this coverage without imposing any cost-sharing requirements (including deductibles, copayments, and coinsurance), prior authorizations, or other medical management requirements. FFCRA, Publ.L. 116-127; and

(b) Section 3202(a) of the Coronavirus Aid, Relief, and Economic Security Act which requires plans and issuers providing coverage for Covid-19 diagnostic testing and related services to reimburse a provider that does not have a negotiated rate, at the cash price for such service that is listed by the provider on a public website. CARES Act, Pub.L. 116-136.

5. The Debtor seeks authority, through this application, to employ Crown as special collections counsel in this case as of the Petition Date, pursuant to the terms of the Fee Agreement, which provides for Crown to receive a contingent fee in the amount of thirty percent (30%) of the gross recovery of any amounts recovered by Crown for the benefit of the Debtor. Further detail regarding the terms of the engagement and compensation are contained in the Fee Agreement attached as **Exhibit B**.

6. The contingency fee discussed above is Crown's standard contingency fee charged to all clients.

7. Section 327(e) of the Bankruptcy Code permits the employment of "an

{2519/000/00589913}

attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." Relatedly, Section 101(14) of the Bankruptcy Code defines a "disinterested person" as, inter alia: (a) one who is not a creditor, equity security holder or insider; (b) one who is not, and was not within the two years preceding the petition date, a director, officer, or employee of the debtor; and (c) one who does not have an interest materially adverse to the estate.

8. The Debtor believes that the attorneys of Crown are qualified to practice in this court and are qualified to advise Debtor on its rights and responsibilities related to the outstanding AR for Covid-19 testing claims.

9. The professional services that Crown will render are summarized as follows:

(a) Contacting and negotiating with third-party health insurance payers to collect outstanding AR for COVID-19 testing on behalf of Debtor;
(b) Conducting discovery related to the outstanding AR for COVID-19 testing on behalf of Debtor pursuant to FRCP 2004;
(c) Advising/counseling Debtor of its rights related to collection of the outstanding AR for COVID-19 testing balances; and
(d) Performing all other services for and on behalf of Debtor that may be necessary or appropriate in the collection of the outstanding AR COVID-19 balances.

10. As set forth in the sworn statement of Richard Hersperger attached hereto as **Exhibit A** (the "Statement"), Crown does not hold or presently represent any parties with interests adverse to the Debtor's estate. Crown is a disinterested person qualified to represent the Debtor in this case.

{2519/000/00589913}

**WHEREFORE**, the Debtor respectfully requests entry of an order authorizing the Debtor to employ Crown Medical Collections, LLC as special collections counsel in accordance with the Fee Agreement attached to the Application as **Exhibit B**, pursuant to 11 U.S.C. §§ 327 and 330, with any compensation or reimbursement or reimbursement of costs to be paid by the Estate only upon application to and approval by the Court pursuant to 11 U.S.C. §§ 328, 330, and 331.

Respectfully submitted,

**SHRAIBERG PAGE P.A.**
Attorneys for the Debtor
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
bss@slp.law
ependergraft@slp.law

By:   /s/ Bradley S. Shraiberg
Bradley S. Shraiberg, Esq.
Florida Bar No. 121622
Eric Pendergraft, Esq.
Florida Bar No. 91927

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via Electronic Filing to those parties registered to receive electronic noticing in this case on October 1, 2024.

/s/ Bradley S. Shraiberg

{2519/000/00589913}

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

Clarity Diagnostics, LLC,            Case No. 24-18938-EPK
                                     (Jointly Administered)

      Debtor.                        Chapter 11
_____/

In re:

Clarity Lab Solutions, LLC,          Case No. 24-19243-EPK

      Debtor.                        Chapter 11
_____/

## **SWORN STATEMENT OF RICHARD HERSPERGER**

Richard Hersperger, pursuant to 28 U.S.C. § 1746, states:

    1.    I am the Chief Executive Officer of Crown Medical Collections, LLC ("Crown") with offices located at 110 W. High Street, Ebensburg, Pennsylvania 15931.

    2.    I am familiar with the matters set forth herein and make this sworn statement in support of the application to employ the Firm as special collections counsel filed by Clarity Lab Solutions, LLC (the "Debtor").

    3.    Unless it otherwise states, this sworn statement is based upon facts of which I have personal knowledge.

{2519/000/00589918}

4.   Except as otherwise may be disclosed herein, a search of the Firm's conflict check index system reveals that our Firm does not presently represent any parties with interests adverse to the Debtor's estate. Nor does our Firm represent or hold any interest adverse to the Debtor or the Debtor's estate with respect to the matter concerning the Debtor's collections.

5.   The professional fees and costs incurred by the Firm, incurred in the course of its representation of the Debtor, shall be subject in all respects to the application and notice requirements of sections 330 and 331 of the Bankruptcy Code and Rules 2014 and 2016 of Federal Rules of Bankruptcy Procedure.

6.   This concludes my declaration.

I declare under penalty of perjury that the foregoing is true and correct.

*Richard Hersperger* (signature)

Richard Hersperger

# EXHIBIT B

# COLLECTION AGENCY

# CONTINGENCY FEE AGREEMENT

This Collection Agency Agreement (this "Agreement") is made as of 11/17/2023 (the "Effective Date"), by and between Clarity Lab Solutions, with its principal office at 1060 Holland Drive, Suite A, Boca Raton, Florida, 33487, (hereinafter referred to as "Client") and Crown Medical Collections, LLC, with its principal office at 100 W High Street, Ebensburg, PA 15931, (hereinafter referred to as "Agency"). Client and Agency are collectively referred to herein as "Parties," and individually as a "Party," as required by context.

WHEREAS, Client requires, from time to time, collection services on certain delinquent accounts, and

WHEREAS, Agency is engaged in the business of performing collection services for third parties, specifically with a specialty in claims for Covid-19 diagnostic testing, and

WHEREAS, Client wishes to retain Agency for the purpose of collecting debts owed to Client by an obligor, i.e. the individual or entity legally liable to Client for payment of the balance on an account, and Agency agrees to be so engaged in accordance with the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual promises, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**1. REFERRAL OF ACCOUNTS FOR COLLECTION.** From time to time and in its sole discretion, Client shall refer legally due and owing unpaid credit accounts ("Referred Accounts") to Agency for collection of the outstanding balance due and Agency agrees to provide the collection services described in this Agreement on such Referred Accounts (the "Services"). Unless otherwise agreed to by the Parties in writing, those Referred Accounts placed by Client with Agency and the Services performed by Agency shall be governed by the terms and conditions of this Agreement.

**2. RIGHTS AND DUTIES OF CLIENT.**

    A. Account Information. Upon referral of an account to Agency for collection, Client will provide Agency with the following information relative to each Referred Account: the applicable creditor name and the required obligor information, including the obligor's name, address, phone number(s) and place of employment; the Referred Account number and balance owing; pertinent account history, claims numbers, account memos, and documentation ("Account Information"). Thereafter, Client shall provide, in a timely manner, all reasonably necessary assistance, information, and documents that Agency may need to respond to obligor validation requests or discovery inquiries relating to a Referred Account. Client further agrees to provide Agency with information concerning all direct payments, adjustments, and disputes on a Referred Account within a timely manner, not to exceed thirty (30) days.

    B. Bankrupt Referred Account. Client shall promptly notify Agency if it receives notification, whether oral or written, of a bankruptcy of an obligor on a Referred Account.

    C. Recall of Accounts. Notwithstanding Client's recall of any Referred Account, Agency shall retain the right to receive a Contingent Fee on any payment, settlement, insurance account or judgment earned on a Withdrawn Account, unless other arrangements are made with Client. This section is not a provision for cancelling this Agreement. Client agrees to pay any out-of-pocket costs, which are commercially reasonable and incurred by the Agency for legal or ancillary services performed on the account. In addition, if Agency cancels a Referred Account and returns it to Client, Client shall not resubmit such account to Agency without prior written notice.

## 3. RIGHTS AND DUTIES OF AGENCY.

A. <u>Legal Compliance</u>. Agency shall comply with and abide by all federal, state and local laws and regulations regarding collection agencies and/or governing the collection of debt and consumer credit reporting in the performance of the Services, including, but not limited, to (i) the Fair Debt Collection Practices Act ("<u>FDCPA</u>") (16 USC 1601 et seq.); (ii) the Fair Credit Reporting Act ("<u>FCRA</u>") (15 USC 1681 *et seq.*); (iii) the FACT Act; (iv) the Equal Credit Opportunity Act (16 USC 1691 *et seq.*); (v) the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* administered by the Federal Communication Commission; (vi) the Telephone Sales Rule, 16 C.F.R. § 310.1 *et seq.*; (vii) Electronic Funds Transfer Act, 12 USC § 226 et. seq.; (viii) any rules promulgated by the Consumer Financial Protection Bureau ("<u>CFPB</u>") or any other federal entity and required by Client; and (ix) any comparable state or local versions of the foregoing (collectively, the "<u>Collection Laws</u>").

B. <u>Monitoring and Self Correction</u>. Because Collection Laws contain subjective legal standards that prohibit conduct that rises to the level of deceit or harassment, Agency agrees to monitor its Agents, employees, and vendors to ensure that their conduct is always lawful, honest, courteous, and business-like. Whenever Agency identifies any issues relating to collection laws, Agency will advise Client and shall immediately correct the conduct or condition that is causing the Agency not to be in compliance with Collection Laws, whether such noncompliance is attributable to a process, procedure or the conduct of an individual Agent or employee of the Agency.

C. <u>No Delegation</u>. Agency shall not assign or delegate any portion of the performance of the Services under this Agreement to any third party over which Agency does not have direct control and supervision without the express written consent of Client. Notwithstanding the foregoing, Agency may use its own employees or contractors retained by Agency to perform the collection services on Referred Accounts. Agency's Attorneys will handle the majority of collection activity.

D. <u>Trust Account</u>. Agency shall maintain a trust account at an FDIC-insured financial institution in trust for Client into which it shall deposit within two (2) business days of receipt, all payments it receives on Referred Accounts (the "<u>Trust Account</u>"), subject to later remittance to Client in accordance with Section 5, below. Agency shall provide Client with the bank location of the Trust Account, and upon demand, provide Client with account records, statements and deposit receipts. However, for security reasons Agency shall not be required to disclose the Trust Account number to Client. Agency shall immediately notify Client of any changes in the location of the Trust Account. Agency shall not co-mingle funds of its other customers in the Trust Account. Client hereby authorizes Agency to act as Client's attorney-in-fact for the sole purpose of accepting funds in payment of debts due Client which have been referred to Agency for collection, including endorsements of checks, money orders, and drafts payable to Client, or jointly to Client and Agency, for deposit into Agency's Trust Account.

E. <u>Settlements</u>. Client authorizes Agency to settle any Referred Accounts, within its reasonable discretion and in good faith to maximize recovery of the balance owing on the Referred Account, without written authorization by Client. Agency agrees to accept payments from obligors via check, debit, credit, recurring ACH, money order, or cash. Agency further agrees to permit obligors to make payment directly to Client on Referred Accounts at any time, provided such any such Referred Account is not in litigation.

F. <u>Bankrupt Referred Account</u>. Upon receipt of information that the obligor on a Referred Account has filed for bankruptcy or receivership, Agency shall immediately cease all efforts to collect on the Referred Account. Agency shall promptly transmit to Client all relevant information regarding the obligor's bankruptcy. If Agency receives written notice of the obligor's bankruptcy, Agency shall promptly transmit such notice to Client. If notice of a bankruptcy filing is provided verbally by the obligor or a third party, Agency shall attempt to obtain information regarding the jurisdiction in which the case has been filed and the case number assigned to the obligor.

G. <u>Legal Services/Scope of Work</u>. Attorney will evaluate and aggressively pursue Client's outstanding Covid-19 testing claims with each health insurance provider and government entity.

H. <u>Federal Law Regarding Payment for Covid-19 Testing</u>. Attorney will pursue Client's Covid-19 testing claims in accordance with the following Federal Laws, along with all other applicable laws:

      (a) Pursuant to Sections 6001 – 6005 of Families First Coronavirus Response Act, group health plans, health insurers offering group or individual health insurance coverage, Medicare, Medicare Advantage, and Medicaid plans are required to provide benefits for certain items and services related to the detection of SARS-CoV-2 or the diagnosis of Covid-19, when those items or services are furnished on or after March 18, 2020, and during the applicable emergency period. Plans and issuers must provide this coverage without imposing any cost-sharing requirements (including deductibles, copayments, and coinsurance), prior authorizations, or other medical management requirements. FFCRA, Pub. L. 116-127.

      (b) Section 3202(a) of the Coronavirus Aid, Relief, and Economic Security Act requires plans and issuers providing coverage for COVID-19 diagnostic testing and related services to reimburse a provider that does not have a negotiated rate, at the cash price for such service that is listed by the provider on a public website. CARES Act, Pub. L. 116-136.

**4. COMPENSATION.** As its sole compensation for performing the Services under this Agreement Agency shall earn and be paid a Contingent Fee (as defined and calculated herein) for any money collected on a Referred Account of Client.

      A. Contingent Fee. For the purposes of this Agreement, the "Contingent Fee" shall be thirty percent (30%) of the gross amount of money collected by Agency on a Referred Account of Client, which Agency is authorized to calculate on the recovered proceeds and withhold from the money collected on any Referred Account as payment for its services under this Agreement.

      B. Direct Payments Made to Client. Agency shall be entitled to receive the Contingent Fee provided for in Section 4.A on all money received on a Referred Account, whether paid to the Agency or to the Client. Client will use reasonable efforts to monitor any payments and/or settlements actually received directly from the obligor in connection with a Referred Account (a "Direct Payment"). Client shall notify the Agency on a regular basis of all Direct Payments, or if the Agency becomes aware of such payment, the Agency will notify Client. Client shall promptly pay to Agency via ACH or wire transfer to the Agency account the Contingent Fee due and payable on any Direct Payment. In the event Client fails to pay to Agency the Contingent Fee due and payable on any payments made directly to Client within seven (7) days of collection, Agency shall be entitled to calculate and invoice Client for said Contingent Fee. Client will provide Agency with a report of all Direct Payments on a monthly basis (a "Direct Payment Statement"), which shall indicate (i) the Referred Account numbers for which Client received a Direct Payment of money, (ii) the amounts received, (iii) the Contingent Fee due and payable, and (iv) the confirmation of payment of the Contingent fee to Agency. The Direct Payment Statement will be submitted to Agency pursuant to the provisions for notice in this Agreement.

      C. Reporting of NSF Checks. Agency shall report to Client, in the next scheduled report, any check returned to Agency due to insufficient funds. In the event that Agency has tendered to Client an Invoice (as defined herein) for any portion of the Contingent Fee due to Agency in connection with any dishonored check, Agency' next monthly Invoice shall designate a corresponding reduction to reflect the obligor's failure to pay on the Referred Account.

      D. Payments on Withdrawn Accounts. If a Referred Account is recalled and withdrawn by Client prior to completion of collection by Agency (pursuant to the terms herein), Agency shall be entitled to and shall be paid a Contingent Fee on any payments received by Agency or by Client within thirty (180) days following the date of the recall of the Referred Account.

**5. REPRESENTATIONS AND WARRANTIES OF CLIENT.** Client represents and warrants to Agency as follows:

      A. All Referred Accounts placed with Agency hereunder are lawfully due and owing, that they are owned by the Client (or its affiliates and customers) and that the Referred Accounts are not subject to any claim of fraud or otherwise wholly or partially invalid due to payment or settlement by the obligor or any other claim or defense.

      B. Information and data on the Referred Accounts is accurate to the best of Client's information and knowledge.

C. Client is not aware of any disputes regarding the Referred Accounts, including any bankruptcy filing or expiration of the applicable statute of limitations.

D. Likewise, Client warrants that it is not in bankruptcy itself, nor does it anticipate filing for bankruptcy. If at any point in time Client becomes aware that it will be necessary to file for bankruptcy, it will notify Agency fourteen (14) days in advance of filing for the same. In the event of Client filing for bankruptcy, any collections efforts are to be treated as an attorney charging lien. The Contingent Fee Agreement will be honored on any and all outstanding collections that may become the subject of funding for the bankruptcy. The Agency's Contingent Fee Agreement will be secured above any other creditor, insofar as it complies with the applicable bankruptcy law and regulations.

**6. VERIFICATION OF DEBT.** Client acknowledges that in connection with the collection of delinquent consumer debts, the FDCPA requires Agency to provide an obligor with verification of the underlying obligation if that request is made to Agency in writing by an obligor within thirty (30) days of Agency's initial communication with the obligor. The law prohibits Agency from collecting on any obligation once a verification request is made to Agency from the obligor until such time as said verification has been mailed by Agency to the obligor. Client acknowledges that in any situation in which it does not provide Agency with the requested verification, Agency can no longer legally attempt to collect the Referred Account. In such case, Client acknowledges that the Agency will return the Referred Account to Client upon request.

**7. TERMINATION OF AGREEMENT.** This Agreement shall be effective upon execution by each of Client and Agency and will continue in effect until terminated as provided herein.

A. Termination without Cause. This Agreement may be terminated without cause by either Agency or Client, upon giving the other Party thirty (30) days written notice prior to the stated date of termination. Termination shall not affect the collection of fees earned before termination date or on accounts in active negotiations with tentative agreements within one hundred and eighty (180) days. This Agreement contemplates the concept of bankruptcy proceedings. Should Client file for bankruptcy, and the amount of collectable gross revenue is a subject of the "assets" of the bankruptcy proceedings, Agency shall continue its efforts, with permission of the court, and maintains an attorney charging lien in order to protect the 30% Contingent Fee Agreement herein.

**8. RETURN OF ACCOUNTS AND REQUIRED INFORMATION.** Upon termination of this Agreement, with or without cause, Agency agrees to use its best efforts to cooperate with Client in such termination. Specifically, but not limited to, Agency shall return to Client all Referred Accounts, along with all Account Information and a current status report of all such Referred Accounts, within thirty (30) business days after the date of termination.

A. Retained Rights. Termination of this Agreement by either Party will not affect the collection enforcement or validity of any accrued obligations owing between the Parties as to any Referred Account. Notwithstanding the foregoing, Agency shall retain the right to receive the Contingent Fee on paying accounts, settlements, insurance accounts or judgments, as well as the right to recover any court costs advanced on said accounts.

**9. INDEMNIFICATION.**

A. By Agency. Agency hereby agrees to indemnify, defend and to hold Client, its officers, directors, employees, agents, attorneys, subsidiaries, affiliated companies, parent companies, representatives, and successors and assigns, harmless from and against all claims, damages, costs, losses or liabilities, including, without limitation, reasonable attorneys' fees and expenses ("Losses") to the extent such Losses arise out of or are primarily related to (i) a breach by Agency of this Agreement including, but not limited to, Agency's failure to comply with all relevant Collection Laws, or (ii) any negligent or wrongful acts, errors, or omissions of Agency or its employees or agents in performing any obligation or duty it has under this Agreement; provided however, that Agency shall have no obligation to indemnify or hold Client harmless due to or arising out of an error in any information furnished by Client to Agency concerning a Referred Account.

B. By Client. Client agrees to indemnify, defend and hold Agency, its officers, directors, employees, agents, attorneys, subsidiaries, affiliated companies, parent companies, representatives, and successors and

assigns, harmless from and against all Losses to the extent such Losses arise out of or are primarily related to (i) the negligent or wrongful acts, errors, or omissions of Client or its employees, agents affiliates, assigns or any creditor or prior account holder, or the employees or agents of any of them, in connection with this Agreement, including but not limited to errors or omissions in connection with information furnished by Client to Agency concerning a Referred Account, or (ii) any collection effort by Client or any other collection agency as to a Referred Account.

C. Notice. Client and Agency agree to notify the other party within three (3) business days of any claim, counterclaim, cross-claim, CFPB, FTC or other federal or state regulatory inquiry or complaint, or any other inquiry or complaint asserted against the other in connection with a Referred Account or group of Referred Accounts.

D. Defense. Each Party will assume its own proper responsibility in connection with any claims made by a third party against Client and/or Agency. Agency is an independent contractor and is solely responsible for the employment, acts and omissions, control and direction of its employees and agents. If the acts of the employees or agents of Agency are the proximate cause of any action brought against Client, Agency will assume full responsibility for the defense of said action and payment of any resulting judgment. If the acts of Client or employees etc. are the proximate cause of any action brought against Agency by third party, then Client will assume full responsibility for the defense of said action and payment of any judgment. The Party providing indemnification has sole discretion in its choice of counsel and may direct the litigation at its discretion.

E. Survival. The Parties agree that these provisions shall apply even in the event one or both Parties deem the cause of action at issue to be frivolous or otherwise unsupported by law. The indemnification obligations provided for in this section shall survive the termination of this Agreement.

**10. LIMITATION OF LIABILITY.** Except to the extent caused by the negligence, breach of this Agreement, or willful misconduct of Agency, Agency shall not be liable for any lost profits, consequential, exemplary, incidental, indirect, or special damages even if advised by Client of the possibility of such damages. Except to the extent as specifically set forth in this Agreement, Client shall not be liable for any lost profits, consequential, exemplary, incidental, indirect, or special damages even if advised by Agency of the possibility of such damages. The provisions of this section shall survive termination of this Agreement or any Amendment hereto.

**11. CONFIDENTIALITY.** The Parties agree that any and all Confidential Information (as defined herein) shall be used solely for the purposes of the lawful performance of this Agreement and shall not be used or disclosed to any third party except as authorized herein or by the Parties in writing.

A. Definition. As used in this Agreement, "Confidential Information" shall include (i) all information regarding a Referred Account or the obligor, (ii) each Party's proprietary information, trade secrets or other business information that is either identified as or should otherwise be reasonably understood to be of a confidential nature, as may be disclosed to the other Party in connection with the performance of this Agreement, and (iii) this Agreement and the nature, terms and conditions of this Agreement. In addition, Agency understands that it will be exposed to certain valuable and confidential information that is the exclusive property of Client or its affiliated Clients, including Consumer Financial Information (as defined in Section 15, below) of obligors and related parties. Agency will be given access to this information solely for the purposes of effectively collecting the Referred Accounts. Agency shall not disclose to any third party any information disclosed by Client or acquired by Agency in the performance of services nor shall it permit any third party access to such information. Agency agrees to keep confidential all information herein and/or related to Client, its investors/clients, a debt owner and the Referred Account obligors. All such additional information is deemed Confidential Information under this Agreement and shall be used solely by Agency as necessary for the performance of Services under this Agreement.

B. Limited Use. Each Party agrees it shall not, without the prior written consent of the other Party or as permitted by the terms and conditions of this Agreement, do any of the following: (i) disclose any Confidential Information to any third party; (ii) permit any third party access to such Confidential Information; or (iii) use Confidential Information for any purpose other than collecting debt on the Referred Accounts referred to Agency by Client.

C. <u>Exceptions</u>. The confidentiality obligations imposed on the Parties by this section shall not apply to Confidential Information which, through no fault of a Party: (i) is required to be disclosed in order to comply with applicable laws and regulations, court orders or other process of law, (ii) is required to be made to any tax, banking or other regulatory authority, or legal or financial advisor of either Party, (iii) is made in connection with the sale or other transfer of any Account by a Party or its successors or assigns, (iv) is made to such Party's current or prospective lenders or investors, (v) was already known to that Party prior to disclosure of the same Confidential Information by the other Party or is independently discovered by the Party, (vi) subsequently becomes available to the public at large without a breach of this Agreement, or (vii) is supplied in the normal course of Agency's business under permissible use requirements.

**12. ENTIRE AGREEMENT.** The Parties acknowledge and agree that this Agreement constitutes the entire Agreement between them and shall supersede all prior agreements, understandings, writings, proposals, representations and communications, oral or written, with respect to the subject matter hereof.

**13. FURTHER ASSURANCES.** Each party agrees to execute such other documents as may be necessary to implement or perform this Agreement.

**14. SEVERABILITY.** If any provision of this Agreement is construed to be invalid, illegal or unenforceable, for any reason, then the remaining provisions of this Agreement shall remain enforceable. Additionally, any failure by Client to enforce Agency's strict performance of any provision of this Agreement will not constitute a waiver of its right to subsequently enforce such provision or any other provision of this Agreement.

**15. AMENDMENTS.** This Agreement cannot be modified or amended except with the written consent of both parties. Such modification shall be in the form of an amendment, letter of understanding or written addendum to the Agreement.

**16. GOVERNING LAW AND VENUE.** This Agreement and any dispute or controversy arising hereunder or otherwise between the Parties to this Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Pennsylvania, without reference to rules governing choice of law. The Parties agree that any legal proceeding of any nature brought by either Party against the other party to enforce any right or obligation under this Agreement or arising out of any matter pertaining to this Agreement, shall be submitted for trial, without a jury, before the federal or state courts located in Pennsylvania. The Parties further agree that the federal and state courts located in Pennsylvania shall have exclusive jurisdiction and the Parties further agree to waive any dispute or defense regarding such jurisdiction, including any claims of *forum non-conveniens*.

IN WITNESS WHEREOF, the Parties, by their duly authorized representatives, have executed this Agreement in duplicate on the date above written.

**CLIENT**

Clarity Lab Solutions

_____
Richard Simpson, CEO and President

**AGENCY**

Crown Medical Collections, LLC

/s/ Richard Hersperger
_____
Richard Hersperger, CEO

11/17/2023

## BUSINESS ASSOCIATE AGREEMENT

### (HIPAA)

This Privacy Agreement, effective ~~October~~ November 17, 2023, is entered into by and between Crown Medical Collections, located at 100 W High Street, Ebensburg, Pennsylvania, 15931 and Clarity Lab Solutions, located at 1060 Holland Drive, Suite A, Boca Raton, Florida, 33487.

I. Term. This Agreement shall remain in effect for the duration of this Agreement and shall apply to all Services delivered by the Business Associate pursuant to this Agreement.

II. HIPAA Assurances. In the event Business Associate creates, receives, maintains, or otherwise is exposed to personally identifiable or aggregate patient or other medical information defined as Protected Health Information in the Health Insurance Portability and Accountability Act of 1996 or its relevant regulations and otherwise meets the definition of Business Associate as defined in the HIPAA Privacy Standards (45 CFR Parts 160 and 164), Business Associate shall:

(a) Recognize that HITECH (the Health Information Technology for Economic and Clinical Health Act of 2009) and the regulations thereunder (including 45 C.F.R. Sections 164.308, 164.310, 164.312, and 164.316), apply to a business associate of a covered entity in the same manner that such sections apply to the covered entity;

(b) Not use or further disclose the PHI, except as permitted by law;

(c) Not use or further disclose the PHI in a manner that had the Covered Entity done so, would violate the requirements of HIPAA;

(d) Use appropriate safeguards (including implementing administrative, physical, and technical safeguards for electronic PHI) to protect the confidentiality, integrity, and availability of and to prevent the use or disclosure of the PHI other than as provided for by this Agreement;

(e) Comply with each applicable requirements of 45 C.F.R. Part 162 if the Business Associate conducts Standard Transactions for or on behalf of the Covered Entity;

(f) Report promptly to the Covered Entity any security incident or other use or disclosure of PHI not provided for by this Agreement of which Business Associate becomes aware;

(g) Ensure that any subcontractors or agents who receive or are exposed to PHI (whether in electronic or other format) are explained the Business Associate obligations under this paragraph and agree to the same restrictions and conditions;

(h) Make available PHI in accordance with the individual's rights as required under the HIPAA regulations;

(i) Account for PHI disclosures for up to the past six (6) years as requested by Covered Entity, which shall include: (i) dates of disclosure, (ii) names of the entities or persons who received the PHI, (iii) a brief description of the PHI disclosed, and (iv) a brief statement of the purpose and basis of such disclosure;

(j) Make its internal practices, books, and records that relate to the use and disclosure of PHI available to the U.S. Secretary of Health and Human Services for purposes of determining Customer's compliance with HIPAA; and

(k) Incorporate any amendments or corrections to PHI when notified by Customer or enter into a Business Associate Agreement or other necessary Agreements to comply with HIPAA.

III. Termination Upon Breach of Provisions. Notwithstanding any other provision of this Agreement, Covered Entity may immediately terminate this Agreement if it determines that Business Associate breaches any term in this Agreement. Alternatively, Covered Entity may give written notice to Business Associate in the event of a breach and give Business Associate five (5) business days to cure such breach. Covered Entity shall also have the option to immediately stop all further disclosures of PHI to Business Associate if Covered Entity reasonably determines that Business Associate has breached its obligations under this Agreement. In the event that termination of this Agreement and the Agreement is not feasible, Business Associate hereby acknowledges that the Covered Entity shall be required to report the breach to the

Secretary of the U.S. Department of Health and Human Services, notwithstanding any other provision of this Agreement or Agreement to the contrary.

IV. Return or Destruction of Protected Health Information upon Termination. Upon the termination of this Agreement, unless otherwise directed by Covered Entity, Business Associate shall either return or destroy all PHI received from the Covered Entity or created or received by Business Associate on behalf of the Covered Entity in which Business Associate maintains in any form. Business Associate shall not retain any copies of such PHI. Notwithstanding the foregoing, in the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible upon termination of this Agreement, Business Associate shall provide to Covered Entity notification of the condition that makes return or destruction infeasible. To the extent that it is not feasible for Business Associate to return or destroy such PHI, the terms and provisions of this Agreement shall survive such termination or expiration and such PHI shall be used or disclosed solely as permitted by law for so long as Business Associate maintains such Protected Health Information.

V. No Third Party Beneficiaries. The parties agree that the terms of this Agreement shall apply only to themselves and are not for the benefit of any third party beneficiaries.

VI. De-Identified Data. Notwithstanding the provisions of this Agreement, Business Associate and its subcontractors may disclose non-personally identifiable information provided that the disclosed information does not include a key or other mechanism that would enable the information to be identified.

VII. Amendment. Business Associate and Covered Entity agree to amend this Agreement to the extent necessary to allow either party to comply with the Privacy Standards, the Standards for Electronic Transactions, the Security Standards, or other relevant state or federal laws or regulations created or amended to protect the privacy of patient information. All such amendments shall be made in a writing signed by both parties.

VIII. Interpretation. Any ambiguity in this Agreement shall be resolved in favor of a meaning that permits Covered Entity to comply with the then most current version of

HIPAA and the HIPAA privacy regulations.

IX. Definitions. Capitalized terms used in this Agreement shall have the meanings assigned to them as outlined in HIPAA and its related regulations.

X. Survival. The obligations imposed by this Agreement shall survive any expiration or termination of this Agreement.

Clarity Lab Solutions, Covered Entity

Signature _____ Date 11/17/2023

Print Name  Richard Simpson  Title: CEO

Crown Medical Collections, Business Associate

Signature _____ Date 11/17/2023

Print Name  Richard G Hespe  Title: CEO